EXHIBIT A

EXHIBIT A

SERVED: March 30, 2018

UNITED STATES OF AMERICA
NATIONAL TRANSPORTATION SAFETY BOARD
OFFICE OF ADMINISTRATIVE LAW JUDGES

DANIEL K. ELWELL,
Acting Administrator,
Federal Aviation Administration,

                                        Docket SE-30384

                Complainant,

        v.

MICHAEL D. KING,

                Respondent.

WRITTEN INTIAL DECISION AND ORDER

Service:  Edward A. Rose, Jr., Esq.          Kate Barber, Esq.
          3029 Marina Bay Dr., Ste 208       FAA Midwest Team
          League City, TX 77573              2300 East Devon Ave
          (Certified Mail & Email)           Des Plaines, IL 60018
                                             (Email Only)

        This was a hearing before the National Transportation Safety

Board held in Cleveland, Ohio on November 14, 2017, and the trial

began at 9:00 in the morning and continued until 4:30 that

afternoon, and then reconvened on the 15th of November at 8:30am

and continued until 11:30am.

        The case is captioned:  Acting Administrator, Federal

Aviation Administration, Complainant, versus Michael D. King,

Respondent.  The Board Docket Number is SE-30384.

        The matter was heard before me, William R. Mullins.  I am an

administrative law judge for the National Transportation Safety Board.  The matter came on for hearing pursuant to notice to the parties and was called for trial on the dates indicated.

The Administrator was represented throughout these proceedings by counsel, Kate Barber, Esquire.  She is with the Federal Aviation Administration Enforcement Division, Midwest Team, in Chicago.  The Respondent was present throughout these proceedings and was represented by counsel, Mr. Edward Rose, Esquire, of League City, Texas.

The parties were afforded a full opportunity to offer evidence, to call, examine, and cross-examine witnesses.  Then subsequent to the trial, the parties have been given an opportunity to submit argument, closing argument, in writing.

STATEMENT OF THE CASE

The matter came on, on an Emergency Order of Revocation that had revoked this Respondent, Mr. King's, Airline Transport Pilot Certificate and Flight and Ground Instructor Certificate, Number 279254.  The Respondent, through Counsel, waived the time provisions of this emergency order.

The Emergency Order of Revocation alleges as follows:

1.    You now hold and at all times relevant hereto held Airline Transport Pilot Certificate and Flight and Ground Instructor Certificate Number 279254.

COUNT I

2.  On or about September 3, 2016, you acted as pilot in

command (PIC) of N98Q, a Cessna CE-500, on a passenger carrying flight from Teterboro Airport (TEB) to Cleveland's Burke Lakefront Airport (BKL).

Paragraphs 1 and 2 were admitted by Respondent.

3.   The Cleveland National Air Show (CNAS) was being held at BKL.  A Temporary Flight Restriction (TFR) was in place to restrict the airspace around BKL for the airshow.

That was admitted by Respondent.

4.   The FAA Air Traffic Organization issued the TFR via FDC Notice to Airmen (NOTAM) 6/2621, restricting the airspace to all operations on September 3, 2016, from 9:30 a.m. to 6:00 p.m. local time, from the surface up to and including 16,000 feet above sea level, within 5 nautical miles of BKL, unless authorized by Air Traffic Control (ATC).

That was admitted by the Respondent.

5.   You radioed ATC and identified your flight as a MEDEVAC flight.  ATC designated your call as "Life Guard 98Q" or (LN98Q).

That was admitted by the Respondent.

6.   The CNAS was halted and the airspace cleared so you and your passengers could land.

Respondent has admitted that, but has denied the allegation of passengers.  Respondent had stated that Respondent operated 98Q pursuant to 14 C.F.R. 61, Flight Instruction.  See also 14 C.F.R. 119.1(e)(1).  Respondent was providing flight instruction to an M.D. student pilot.

7.  You landed LN98Q and proceeded with your five passengers to leave in a rental car.

That has been denied by the Respondent's answer.

8.  There was no urgent medical emergency, vital organs or urgently needed medical equipment aboard LN98Q.

That was denied.

9.  You intentionally reported falsely to ATC stating that you were a MEDEVAC flight in order to land at BKL when there was a TFR in place preventing you from operating in the airspace around and landing at BKL.

That was denied by the Respondent in his answer.

10.  You operated N98Q within a restricted area contrary to the restrictions imposed, or within a prohibited area, when you obtained permission based upon false information that you relayed to ATC.

That was denied.

11.  Your operations, as described above, constituted a careless or reckless operation so as to endanger the life or property of others.

That was denied.

                              COUNT II

12.  On September 3, 2016, after the flight to BKL, you operated N98Q on a passenger carrying flight from BKL to Midway International Airport, Chicago, Illinois (MDW), then from MDW to Cincinnati Municipal Airport-Lunken Field (LUK).

That was admitted in part.  Specifically, Respondent responded to paragraph 12 admitting in part; denying in part as pertained to passengers.  Respondent further alleged that he operated N98Q pursuant to 14 C.F.R. 61, Flight Instruction.  See also 14 C.F.R. 119.1(e)(1).  Respondent was providing flight instruction to an M.D. student pilot.  This particular flight was a training flight.

13.  On September 4, 2016, you operated N98Q on a passenger carrying flight from LUK to TEB.

In Respondent's answer, he admitted in part; denied in part as pertains to passenger.  Respondent operated N98Q pursuant to 14 C.F.R. 61, Flight Instruction.  See also 14 C.F.R. 119.1(e)(1).  Respondent was providing flight instruction to an M.D. student pilot.  This particular flight was a training flight.

14.  The above flights were operated at the request of Dr. Marvell Scott and his team to visit his patients that were located in their respective cities.  The flights were for the purpose of air transportation and furtherance of Dr. Scott's business.

That has been denied by the Respondent.

15.  You were compensated for the flights that were provided to Dr. Scott and his team.

That has been denied by the Respondent.

16.  You do not have an air carrier or commercial operator certificate to provide air transportation for hire.

That was admitted by the Respondent.

17.  On the flights specified above, you conducted operations in N98Q as a direct air carrier or as a commercial operator without the appropriate certificate or operation specifications.

That has been denied by the Respondent.

18.  You offered to provide and consequently conducted operations for compensation when you were not authorized by the Federal Aviation Administration.

That has been denied by the Respondent.

19.  You conducted a commercial passenger operation for compensation or hire under part 121 or part 135 of this chapter when you were not a direct air carrier.

That was denied by the Respondent.

As a result of the foregoing, it appears that you violated the following Federal Aviation Regulations:

a.  14 C.F.R. § 119.5(g), which states, in relevant part, no person may operate as a direct air carrier or as a commercial operator without, or in violation of, an appropriate certificate and appropriate operations specifications.

b.  14 C.F.R. § 119.5(k), which states, in relevant part, no person may advertise or otherwise offer to perform an operation subject to this part unless that person is authorized by the Federal Aviation Administration to conduct that operation.

c.  14 C.F.R. § 119.33(b), which states, in relevant part, a person other than a direct air carrier may not conduct any

commercial passenger or cargo aircraft operation for compensation or hire under part 121 or part 135 of this chapter.

   d.   14 C.F.R. § 91.145(d), which states, in relevant part, when a NOTAM has been issued in accordance with this section, no person may operate an aircraft or device, or engage in any activity within the designated airspace area, except in accordance with the authorizations, terms, and conditions of the temporary flight restrictions published in the NOTAM.

   e.   14 C.F.R. § 91.13(a), which states, in relevant part, that no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

   And all five of those regulatory allegations that were said to have been violated by the FAA were denied by the Respondent in his answer.

   And further in Respondent's answer, in addition to the responses that I have just enumerated, the Respondent raised the following affirmative defenses:

   1.   Failure to state a cause of action.

   2.   Respondent reasonably relied upon the advice of the medical doctor with respect to the emergency.  Respondent does not have the medical experience and training to challenge the request of a qualified medical doctor or specialist.

   3.   The Administrator's complaint is subject to dismissal as stale or barred by the doctrine of laches.

   4.   The Administrator's failure to follow internal procedure

warrants a waiver of the revocation of Respondent's licenses.

5.   The Respondent is a qualified flight instructor with a type rating and is authorized to be compensated for flight instruction.

6.   Petitioner has relied upon the AIM (Airman's Information Manual), which is non-regulatory.

7.   Respondent operated N98Q pursuant to 14 C.F.R. 61, Flight Instruction.  See also 14 C.F.R. 119.1(e)(1).  Respondent was providing flight instruction to an M.D. student pilot.  This particular flight was a training flight.

8.   Respondent reserves the right to assert additional affirmative defenses at trial after receiving discovery and further investigation into this matter.

That was basically the statement of the case with the answers.  The complaint and the answer has raised the following issues:

ISSUES

1.   Was there a medical emergency on the date in question?

2.   May a pilot rely on a medical doctor to determine if a medical emergency exists?

3.   During the flight on September 3rd, was Dr. Scott receiving flight instruction, and was he a student pilot of the Respondent on that day?

4.   Can a flight be combined for business and flight instruction?

SUMMARY OF THE EVIDENCE

At the outset of the trial, the parties entered into the following three stipulations:

1.   First of all, it was stipulated there was a TFR at the time of the flight into the airport in Cleveland, Ohio, and that TFR has been marked and is admitted into evidence as Exhibit A-8.

2.   Respondent radioed Air Traffic Control and identified the flight as a MEDEVAC and designated the call sign as "Life Guard 98."

3.   ATC designated the call sign as "Life Guard 98Q."

The first witness called by the Administrator was Mr. James Tucciarone.  This witness testified that he owns an air boss company and he runs airshows.  He was for 35 years an air traffic controller for the Federal Aviation Administration and he was the air boss of the Cleveland National Air Show on September 3, 2016.

He received a call of an incoming Lifeguard flight, which was 20 miles out, and at the time he had three drones operating around the runway and he had a Golden Knight aircraft climbing to flight level 12- to 13,000 feet for the purpose of dropping parachutists. Once he was advised of the incoming Lifeguard flight, he cleared the runway of the drones.  He didn't change any of the flight instruction to the Golden Knight aircraft.

He testified that the aircraft landed about 6 to 8 minutes after he was notified.  He was advised by some of his staff people that this did not look like a MEDEVAC flight because there was no

ambulance, no doctors in scrubs, no coolers with possible organs.
This witness, Mr. Tucciarone, advised the FAA that it did not
appear to be a MEDEVAC flight for those reasons.  Mr. Tucciarone
testified that he assumed that you had to have a patient on board
the aircraft and/or doctors in scrubs and possible organ transfer
in coolers, and those were not seen.

As to Mr. Tucciarone's credibility, he was very credible.  He
testified that he assumed all those things and he simply reported
that about the airshow.

The second witness called by the Administrator was
Mr. Scott C. Hoyng.  Sergeant Hoyng testified that he was in the
United States Air Force and had been for 27 years; he was a Master
Sergeant E8.  And he had been supporting the Cleveland National
Air Show since 2005, so he had been there for a number of years.
His job was to run the hot ramp and he was in charge of anything
that was moving on the ground.  His official title, he stated, was
that he was the grounds operations manager for the hot ramp, and
this was his 12th year.

He was advised of the incoming MEDEVAC flight, and he went
there to his vehicle and he was going to lead this aircraft to the
parking ramp, and the pilot requested that he go to the fixed-base
operator (FBO).  Sergeant Hoyng testified he thought that was odd
because usually a MEDEVAC flight went to the terminal and met an
ambulance or the police.

But, in any event, Sergeant Hoyng said that he took the

passengers from the flight to the FBO, and he had some of his team tow the aircraft to the parking ramp.  As it turned out, that was a sterile or static parking area, but that's where Sergeant Hoyng's people had the aircraft parked.

Sergeant Hoyng testified that over 12 years he had seen 15 to 25 MEDEVAC flights but he never had one that didn't have a police escort.  He testified that when the team returned back, they had to wait for the Navy Blue Angels to complete their portion of the airshow.  This was in the afternoon.  Sergeant Hoyng testified that he didn't know if doctor scrubs and a cooler was required for a MEDEVAC flight.

Sergeant Hoyng was a credible witness.  He testified simply to what he did that day, and he testified about his opinion that he didn't know what was required of the MEDEVAC flight, but just that he had seen those flights in the past years they had always had a police escort.

The third witness called by the Administrator was Mr. Tom Sanzo.  Mr. Sanzo testified that on September 3rd he was the principal operations inspector with the Cleveland Flight Standard District Office, and he had been 9 years with the Federal Aviation Administration.  He has an ATP rating.  He's a certified flight instructor and a certified instrument instructor and multi-engine instructor, and he had about 7,000 hours.

On the date in question, September 3, 2016, at the Cleveland National Air Show, Mr. Sanzo testified that he was the FAA

inspector in charge.  He said that their job was to oversee safety
and regulatory compliance.  He said he had a minimum of three
inspectors working the airshow.

He testified in the afternoon he saw this 98Q parked in the
static area with people standing around.  He testified he went to
the aircraft to see who they were and why they were there.
Obviously based on that testimony, he had not received any
information from the air boss or Sergeant Hoyng, the ground ops
manager, about this airplane.  He said he went to the airplane and
he met with Dr. Scott, who said they were there to provide life-
saving procedure for someone in the Cleveland area.

Mr. Sanzo stated that after he talked to Dr. Scott he saw his
partner, Mr. DeLotell, coming over and he turned and was going
back to talk to Mr. DeLotell and that the airplane just left.  But
on cross-examination he testified that they did not have authority
to detain or stop anyone, nor did he ask the airplane to stay in
the area.

Mr. Sanzo testified that he started the investigation
involving this incident but was transferred by the FAA to another
department and he turned over the investigation to Mr. DeLotell.

Mr. Sanzo said that this flight was not representative of his
air ambulance experience.  He said there were no scrubs on any of
the crew, no surgical crew, no coolers, no ambulance, and no
police escort.  He did state that the designation of the Lifeguard
flight requires an expedited handling by ATC.  He did state on

cross-examination that the aircraft complied with all ATC instructions and that the Lifeguard designation starts with the filing of the flight plan.

Also, on cross-examination, he testified that scrubs were not required.  He also testified that if flight instruction was being given he wouldn't need to be a 135 flight.  He also stated that, in his opinion, flight instruction was not being given, but he had no evidence to the contrary.

He did state that if the doctor was receiving flight instruction that could change his response.  The doctor did tell him that they were in town to perform life-saving medical treatment.  The witness, Mr. Sanzo, testified that he didn't think a pilot could be a student pilot in a turbine-powered aircraft, that was his experience.

The credibility of this witness, again, because of his relationship to the case -- the first two witnesses were air boss and his staff, the people who are working the airshow, and they talked about their experience, but Mr. Sanzo seemed to be focused on a non-medical flight.  His focus seemed to be that it couldn't have been a flight where the doctor was receiving flight instruction, and his focus on a violation impacts his credibility. I think that his credibility was seriously brought into question by his position that his opinions were based on his experience and not on any regulatory violations.

The fourth witness called by the Administrator was

Dr. Marvell Scott. Dr. Scott was called by deposition.

Let me state here that there were two witnesses called prior to Dr. Scott by the Respondent as witnesses out of time, and this was all on the first day of the trial, and I will discuss their testimony when I get to the Respondent's case in chief.

Dr. Scott was called by deposition. Dr. Scott is a physician whose office is in New York City and he has a sports medicine -- Performance Health, I think is the name of his company, and he operates with a team of physicians, chiropractors, nurses, nurse practitioners.

He testified that he had known Respondent since June, some 3 months prior to September 3rd. He was receiving flight instruction from this Respondent during that period of time and he was receiving flight instruction as they proceeded to Cleveland on that day.

He testified that he met Respondent, Mr. King, while he was chartering a flight, but he was not chartering a flight with Mr. King, and he started working after that period of time with Mr. King to work on his student pilot's license.

He did testify that he believed he had an emergency, that he had received a phone call at 1:00 in the morning from his client who was in Cleveland, and he decided to go there immediately. He contacted the Respondent, Mr. King, to take him there and receive flight instruction. The doctor did testify at the time of this flight that, in addition to receiving flight instruction, he had

purchased and owned one-seventh of this Cessna Citation aircraft.

The doctor testified that on the morning in question, he went to the airport.  As part of his student pilot activities he did the walk-around inspection of the aircraft and then got into the right front seat and he went over the checklist.  He stated that he was aware that the flight was using the MEDEVAC call sign and he testified that he did the pre-flight inspection before they left Cleveland, or at least parts of the pre-flight inspection.

He did testify that he did have medical equipment on board.  I think the testimony was there was two bags of material and a table, a folding table, that they used.  He identified Exhibits A-2 and A-3, which were his consultation reports, captioned consultation report, concerning the two patients, the one in Cleveland that he saw that day and also one in Chicago.

He was shown a bill, which was marked as Administrator's Exhibit 4, and the bill was for $14,420.  He didn't know if payment had been made on that.  He talked about most of his personal business was run through an assistant, and if this bill had been paid it would have been through the assistant, or not.

He did testify that he did not recall if he had flown with the Respondent after September 3rd.  He thought that he probably had not.  He couldn't recall, but he said it probably was because he quit flying at the end of the baseball season.  Most of his clients in Chicago and Cleveland were professional baseball players, and at the end of the baseball season the doctor said

most of his practice was in New York and he was not following these athletes around as they traveled.

He identified A-6 as his letter that he wrote, from the doctor to Mr. DeLotell, and in that letter he said he had an urgent medical situation in Cleveland and in Chicago.  He said the purpose of his flight was urgent and also to get flight instruction.  He identified A-7 as the logbook.  The logbook was hardly discernible.  The copy was very poor and was identified later, portions of it, pertaining to the doctor by the Respondent when he was on the stand.

On cross-examination, the doctor testified that Respondent was doing a lot of work for him, not only student flying but he was also coordinating all of his travel, and that included, and as Respondent testified, that included all aspects of his travel: rental cars, charter flights, not with Respondent flying but other charter flights, hotels and so forth.  He also testified that the Respondent had told him, and at the time he was getting this instruction from Respondent in the turbine-powered aircraft, he was also working on his student pilot's license in Cessna 172s and 182s.

On redirect, he reiterated again that he had told the Respondent, Mr. King, that there was a medical emergency on that morning.

Dr. Scott's credibility was valid.  He obviously has a very specialized medical practice by his testimony, and that much of

his day-to-day functions are handled by his staff and not him.  He wasn't sure about payments.  He wasn't sure who called the Respondent to get that flight this morning, although he testified that he told Respondent at the time that it was an emergency. There was no indication that his testimony was anything other than credible.

The fifth witness called by the Administrator was Nicholas DeLotell.  He testified he was a principal operations inspector for the FAA.  He had 3700 hours and has an ATP and several other ratings.

On the date in question, he was assisting Inspector Sanzo, and he first learned of possible problems about noon on that date, and at that time he thought that crew and passengers had left the airport.  Late in the afternoon, they learned the crew and passengers had returned to the aircraft, which is in a sterile area, and his testimony would indicate that he was upset about it being parked where it was parked, although the evidence was clear from Sergeant Hoyng, that Sergeant Hoyng's crew had parked the aircraft where it was sitting.

Mr. DeLotell identified Exhibit A-14, which is the statement of the air boss, Mr. Tucciarone, and it was admitted.  The witness said, based on Dr. Scott's letter, that Dr. Scott somehow had to know that Respondent offered transportation services.  Obviously this indicates a position that this inspector was taking, this witness; however, the evidence was very clear that he knew of the

Respondent's transportation services because the doctor was a student pilot of the Respondent at the time of this flight.

He identified or discussed, Exhibit A-4, which was a statement from the Respondent to the doctor, and he did note that it was itemized, that there was flight instruction itemized on this statement.

Later, he says that he learned that the doctor considered these flights as flight instruction, but he believed it was in violation of FAR 91.145, which is the requirement of complying with a NOTAM.

Mr. DeLotell identified Exhibit A-9, which is the Airman Information Manual. The Airman Information Manual, specifically, is captioned, the section that was highlighted, "Air Ambulance Flights." Mr. DeLotell specified that the very nature of MEDEVAC flights involve carriage of persons for hire, and that obviously was his opinion.

He then identified Exhibit A-11, which is a Facebook page. It was established that this was a Facebook page for the Respondent's flight school, but talks about that Respondent offered executive transportation services, and Mr. DeLotell believed that he could do 135 flights. He further testified that the Respondent's company, Accent Aviation, did not have a 135 or a 121 certificate.

The witness also testified that he believed from the doctor's letter, which was A-6, that he had contacted Respondent for his

transportation needs.  He did not mention that he was a student pilot, nor did Mr. DeLotell mention at that time that Respondent had a one-seventh interest in this airplane.

Mr. DeLotell did testify that he believed that Respondent's conduct was in wanton disregard of FARs and in deliberate defiance of industry standards and the FAA guidance and best industry practices.  He talked about, although he was questioned about it, he said that the MEDEVAC call sign was reserved for patients and people in dire need of emergency assistance, but on cross-examination could not explain where the dire need statement came from except that it was his own opinion.

His testimony was that a pilot could not rely on a doctor's evaluation of a medical emergency because this pilot, Mr. King, the Respondent, had an ATP rating and he was responsible for that sort of information.  But on cross-examination, he did admit that the ATP rating and pilot in command responsibility related to all phases of the aviation operation, not to medical.

Mr. DeLotell, on cross-examination, said that looking at the facts of this case, he believed that the Respondent, because he was ATP, lacked the knowledge required of an ATP, and there was some comment at this time about a truth-in-leasing regulation. And there was some talk, apparently, as it turned out later in the evidence, about a leasing contract that the doctor and Mr. King, the Respondent, were going to enter into, but it was never entered into, and this particular document or reference to a truth in

leasing or a leasing arrangement just had no relevance to what I
was hearing on that date, simply because it was not ever executed
between the parties.

As to Mr. DeLotell's credibility, again as with Mr. Sanzo, it
was clear under the evidence that they had made a determination
that (1) this was not an emergency, and (2) that it was a
transfer, hauling of passengers for hire, and it seemed like they
just refused to look at all of the evidence that the Respondent
brought forward as to the student instruction, which was
unrebutted, and I'll talk about again.  But just as to the
credibility, both Mr. Sanzo and Mr. DeLotell's credibility was
seriously impacted by the fact that it was clear that they started
this investigation with a violation in mind and they refused or
wouldn't consider the evidence about the student instruction that
was being given that day.  They also refused to accept the
doctor's statement that this was an emergency.

However, they both testified, or certainly Mr. DeLotell did,
that they did not consult with any medical experts in their
investigation, although it's obvious and clear to this Judge, that
the FAA has a huge team of doctors that would have been available
to assist or offer testimony about whether or not they thought
this was a medical emergency.  I believe that Mr. DeLotell's
credibility, in this case, was tainted and is just not credible as
to these violations.

With the presentation of Mr. DeLotell's testimony, after

that, the Administrator rested.

The Respondent's case in chief, the first two witnesses were
the ones that were called out of time on the first day of the
trial.

The first witness was Mr. Fred Scheid.  He's an electrical
designer and he's known the Respondent since 2001.  He received
his second in command type rating in the Cessna Citation from the
Respondent and believes he's a good instructor.

He testified on cross that he went to the Respondent for his
private pilot rating back in 2001.  Further on cross -- I guess it
was an attempt to impeach this witness by asking him about whether
or not he had passed or failed some of his written exams for his
ratings, and he testified that he had failed one or two.  However,
it was the opinion of this Judge that that sort of information
just didn't impact his credibility.  Respondent's flight instruc-
tion was not an issue in this case.

The second witness called was Mr. Pavel Levter.  Mr. Levter
testified that he was currently a pilot for United Express Air-
lines, but he was on the aircraft, on the flight to Cleveland and
on Chicago that day, and that he was along on the flight -- he
didn't know the doctor, hadn't met him before, the doctor didn't
remember him, but Mr. Levter was along to receive flight instruc-
tion in the event the doctor got tired and wanted to move out of
the right front seat, and then Mr. Levter would be there to take
flight instructions on the flight.

This was, he testified, a procedure that they had used in the past. He testified that the doctor stayed in the right seat and he observed the doctor doing a pre-flight check and receiving flight instruction along the flight. He further testified that he was on the flight just as a standby situation to get second in command time should the doctor get tired.

There was no serious question about his credibility. He testified about the flight. He is a current pilot. I thought his credibility was solid and it was consistent with the testimony of the Respondent, the doctor, and the documentation that was submitted by the Respondent about the billing and the student fees charged for student flying.

The third witness called by the Respondent was the Respondent himself, Mr. King. Mr. King testified that he has 27,000 hours of flight time. He has 11 different type ratings, including an MD11. He did testify that he provides recurrent training for FAA personnel in the Houston area. He has a website, which has been online for 16 years, and he identified that website and that was Respondent's Exhibit 2, which was admitted.

He said he has never held out or advertised as a 135 operator. He says executive pilot services on the webpage simply meant that he would be a contract pilot for someone who owned an aircraft; if they needed a pilot they could hire him. This certainly seemed to be solidified by the large number of type ratings he had in high-performance aircraft.

The Respondent's Exhibit 4 was a number of pilots that had received Citation ratings from the Respondent.  The Respondent testified that he started training Dr. Scott in June of 2016.  On September 3rd, the doctor had some 20-plus hours of flight instruction in the Citation from the Respondent.  He said through the summer months he was employed by Dr. Scott to do all aspects and logistics of Dr. Scott's travel.  The documentation presented certainly confirmed that, that he was getting rental cars, hotel, food for the doctor and that the doctor owned one-seventh of the airplane.  And also the documentation showed that the doctor paid for one-seventh of the maintenance bill that came in on the airplane.

The Respondent testified that the doctor entered into this contract to buy and purchase, and paid Respondent $50,000 for his one-seventh of this aircraft, and that was in the summer months before September 3rd.  He testified that at the time of the trial that Dr. Scott still owned one-seventh of his airplane.

He said on the date the aircraft was parked where the air boss, or in this case it apparently was Sergeant Hoyng, told him to park and/or his crew had parked him there.  He testified, as did Dr. Scott, that when Mr. Sanzo came to talk to him that he was very short with him.  He kept asking questions, but before they could answer he would interrupt and go on.

There was some question about subpoenas; however, that was never resolved at the trial.  The Administrator was trying to say

he hadn't responded to subpoenas, but then that issue was dropped
and so that really wasn't anything for my consideration.  It
certainly appeared from the testimony that the Respondent and his
counsel had complied with all of the discovery requests by the
Administrator.

                          FINDINGS OF FACT

     Based on the testimony and the evidence presented, including
the documentary evidence, I make the following findings of fact:

     1.  Dr. Scott received a call in the middle of the night in
reference to a medical emergency of one of his patients in
Cleveland and he elected to go the next morning to Cleveland to
deal with that issue.  The doctor believed it was a medical
emergency.  Secondly, and more importantly, the doctor advised
Respondent that the flight was a medical emergency.  And in that
regard, to the medical training, I also find this finding of fact
that Respondent had no medical training.

     2.  From May to September, Dr. Scott was receiving flight
instruction from the Respondent, King, and was receiving flight
instruction on September 3, 2016 on the flights that day into
Cleveland.  That's supported not only by the testimony of the
passenger, Mr. Levter; the doctor, the Respondent, but also the
documentation that the Administrator has offered; specifically, I
believe it was A-4.

     3.  Dr. Scott owned a one-seventh interest in the aircraft
on September 3rd.

4.   All flight operations in the area covered by the temporary flight restriction were authorized by Air Traffic Control.

                            DISCUSSION

In this case, and as an administrative law judge for the National Transportation Safety Board for 29 years, I believe this is the first case that I've heard where there was discussion about a letter of investigation being issued and that letter of investigation was never offered into evidence.  That's concerning in this case because there were two focuses:  There was a focus about whether it was a medical emergency, and there was a focus about whether this particular flight was for compensation or hire.

The witnesses, in particular Mr. DeLotell, seemed to focus on the response from the doctor and the Respondent, and what they said in their response to the LOI, but the Court had no way of knowing what was requested in the LOI, and I suspect that the focus may have been on the medical emergency.  And then there was a jump, if you will, from the response they got in that regard to the failure, if there was one, to talk about this was an instructional flight.

Another comment here was pointed out in argument of counsel. The Airman Information Manual is not regulatory, it's at best advisory, and the particular section that was highlighted by the Administrator in this case involved air ambulance flights.  This was not an air ambulance flight.  It was a flight involving a

medical emergency per the testimony of the doctor. So the reference, and all of the allegations surrounding the Airman Information Manual simply did not fit this particular flight on the date in question.

The testimony, and I've already talked about the credibility of Mr. Sanzo and Mr. DeLotell, but they seemed to totally disregard, or simply disregard, all of the evidence that they had prior to the issuance of this emergency order about the fact that this was a student pilot situation between Dr. Scott and the Respondent. There was even one comment from -- I think it was Mr. Sanzo, he said, you couldn't have it both ways, you couldn't have a medical emergency and student instruction going at the same time, but then later on cross-examination he admitted that you could.

Another comment would be that Mr. DeLotell, he said he believed that MEDEVAC implied patients or organs being transferred, but that was his belief. There wasn't any regulatory requirement that a patient be on board or that organs be on board, and apparently neither of the witnesses ever believed there was medical equipment on board, although the testimony of the doctor and Respondent was that there was medical equipment on board.

The initial thrust of this case was a medical emergency, and it seems that the Administrator should not revoke on an emergency basis a certificate based on the experience or belief of an inspector, or inspectors, but it would seem more appropriate that

a revocation on emergency basis of a certificate must be based on a violation of regulations known to, or should have been known by, the Respondent.

There is simply no showing in this evidence of a violation of any regulation.  The TFR, everything that the Respondent did in the TFR, was authorized by Air Traffic Control, which is a requirement of the TFR.

The testimony was overwhelming that this was an instructional flight for the doctor, not only the testimony of Mr. Levter, the passenger; the doctor, Dr. Scott; the Respondent, Mr. King, but the exhibits that were presented in response to discovery and admitted here today shows that the doctor was charged for flight instruction, and not only that but he did own a part of the airplane that he was getting flight instruction in.

Another interesting aspect of this case is that the doctor, Dr. Scott, has a particular medical specialty, sports medicine.  A medical specialty would certainly almost dictate or mandate that the Administrator presents some medical testimony to contradict the doctor's opinion that this was a medical emergency, and there was none shown.

The Respondent, Mr. King, had no reason to question the medical expertise of the doctor.  He had no reason to question the doctor when the doctor said that this was a medical emergency.  He had no reason to inquire about who the patient was, why did the doctor think it was an emergency.  That was not the responsibility

of the pilot in command.

And just as an aside, and I commented on this earlier, but apparently there was a lack of communication between the air boss and his staff and the FAA people, which seemed to inure to the disbenefit of this Respondent.

Mr. Sanzo was very upset that there was an airplane sitting out there in this sterile parking area.  But the testimony of Sergeant Hoyng was that's where his people put it, and when they brought the passengers and the doctor back and the pilot back to the airplane, they brought them back to where the airplane was parked by Mr. Hoyng.  It seemed at that point that the Administrator proceeded with a violation focus as opposed to a legitimate trying to find out why were they there, was it a medical emergency, and all of the other issues that seemed to have been disregarded by the Administrator.

CONCLUSION OF LAW

First, a pilot should, and certainly may, defer medical questions to trained medical personnel.  In this case, the pilot, who was not medically trained, was advised that it was a medical emergency and he did not have the requisite training to question that determination by the doctor.

Second, there was no showing that there was a violation of 14 C.F.R. 119.5(g), which states that no person may operate as a direct air carrier or commercial operator without, or in violation of, the appropriate certificate and appropriate operations speci-

fications.  This was a student pilot/owner pilot situation that day and all of the evidence established that.

Third, there was no showing of violation of 14 C.F.R. 119.5(k), which states that no person may advertise or otherwise offer to perform an operation subject to this part unless that person is authorized by the Federal Aviation Administration to conduct that operation.

Again, the testimony was that the webpage and the Facebook page did not say that Respondent had a 135 operation.  He said he provided pilot services, and his testimony in that regard was very compelling.  He provided he was a pilot for any number of high-performance aircraft in case someone needed a pilot.

Fourth, there was no showing of a violation of 14 C.F.R. 119.33(b), which states, in relevant part, a person other than a direct air carrier may not conduct any commercial passenger or cargo aircraft operation for compensation or hire under part 121 or part 135 of this chapter.  Again, the evidence was clear this was a student pilot operation, although he was taking the doctor on a medical emergency.

Fifth, there was no showing of a violation of 14 C.F.R. 91.145(d), which states, in relevant part, when a NOTAM has been issued in accordance with this section, no person may operate an aircraft or device or engage in any activity within the designated airspace area except in accordance with the authorizations, terms, and conditions of the temporary flight restriction published in

the NOTAM.

The temporary flight restriction specifically said that the only deviation from the terms of the NOTAM had to be authorized by ATC.  It's clear under this evidence that this flight was done with the concurrence and at the direction of ATC.

Finally, there was no showing of a violation of 14 C.F.R. 91.13(a), which states, in relevant part, that no person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another.

There was no showing that there was any careless or reckless conduct on the part of this pilot, the Respondent, Mr. King.  He flew into this TFR with the authorization of Air Traffic Control. He was on a medical emergency that he had been advised of by a medically trained person, the doctor, and there was certainly, without any of the showing of these other violations, there was no residual violation of any of these others.

All findings of fact and conclusions of law relevant and necessary to determination of contested issues herein have been found especially and appear in this decision.  Proposed findings of fact or conclusions of law that are inconsistent with this decision are denied.

ORDER

IT IS THEREFORE ORDERED that safety in air commerce and safety in air transportation does not require an affirmation of the Administrator's Emergency Order of Revocation as issued.

Specifically, I have found that based on the credibility of these aviation inspectors and the evidence presented, which was uncontroverted, the testimony of the three witnesses that were on board the aircraft that day and the documentation that justifies or substantiates the student pilot activity, that the Administrator has failed to establish these allegations by a preponderance of reliable and probative evidence.  Therefore, the Administrator's Emergency Order of Revocation is overruled.

AND IT IS SO ORDERED.

Entered this 30th day of March, 2018, at Washington, DC.

_____
WILLIAM R. MULLINS
Administrative Law Judge

## APPEAL (WRITTEN INITIAL DECISION)

Any party to this proceeding may appeal this written initial decision by filing a written notice of appeal within 10 days after the date on which it was served (the service date appears on the first page of this decision). An original and 3 copies of the notice of appeal must be filed with the:

National Transportation Safety Board
Office of Administrative Law Judges
490 L'Enfant Plaza East, S.W.
Washington D.C. 20594
Telephone: (202) 314-6150 or (800) 854-8758
Email: aljappeals@ntsb.gov

That party must also perfect the appeal by filing a brief in support of the appeal within 30 days after the date of service of this initial decision. An original and one copy of the brief must be filed directly with the:

National Transportation Safety Board
Office of General Counsel
Room 6401
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
Telephone: (202) 314-6080
Email: Boardappeals@ntsb.gov

The Board may dismiss appeals on its own motion, or the motion of another party, when a party who has filed a notice of appeal fails to perfect the appeal by filing a timely appeal brief.

A brief in reply to the appeal brief may be filed by any other party within 30 days after that party was served with the appeal brief. An original and one copy of the reply brief must be filed directly with the Office of General Counsel in Room 6401.

**NOTE**: Copies of the notice of appeal and briefs **must** also be served on all other parties to this proceeding.

An original and one copy of all papers, including motions and replies, submitted thereafter should be filed directly with the Office of General Counsel in Room 6401. Copies of such documents must also be served on the other parties.

The Board directs your attention to Rules 7, 43, 47, 48 and 49 of its Rules of Practice in Air Safety Proceedings (codified at 49 C.F.R. §§ 821.7, 821.43, 821.47, 821.48 and 821.49) for further information regarding appeals.

**ABSENT A SHOWING OF GOOD CAUSE, THE BOARD WILL NOT ACCEPT LATE APPEALS OR APPEAL BRIEFS.**